**Marian F. RAML, Claimant and Appellee,**

v.

**JENKINS METHODIST HOME, Employer and Appellant.**

**No. 14960.**

Supreme Court of South Dakota.

Considered on briefs Nov. 19, 1985.

Decided Jan. 22, 1986.

Nancy J. Turbak, Watertown, for claimant and appellee.

Ronald L. Schultz of Green, Schultz & Roby, Watertown, for employer and appellant.

FOSHEIM, Chief Justice.

Marian Raml (Raml) sought unemployment insurance benefits after she was released as a nursing home LPN. The State Unemployment Insurance Division found that Raml was "discharged because she did not follow proper procedure in caring for

residents. Misconduct has not been established." Therefore, Raml was not disqualified from receiving benefits and since Jenkins Methodist Home (nursing home) is a reimbursing employer, benefits paid to Raml would be chargeable to them. The nursing home appealed.

A hearing was held in which Raml was represented by counsel. The Appeals Referee listened to several witnesses, arguments of counsel, and entered detailed findings which methodically addressed complaints raised against Raml and affirmed the Benefit Section's decision. The Secretary of the Department of Labor adopted the Findings of Fact and Conclusions of Law made by the Appeals Referee and affirmed his decision. The Circuit Court affirmed the Secretary's decision. We also affirm.

The complaints lodged against Raml, followed by the Appeals Referee's findings, are summarized below:

a. failed to crush patient's pills—only one occurrence year and one-half ago;

b. put patient to bed earlier than son preferred—done for medical reasons and son agreed when reason explained;

c. turned off room lights of patient who was very afraid of dark—isolated instance of inadvertence and not misconduct;

d. failed to give oxygen when patient requested pursuant to standing doctor's orders—Raml's procedure with this patient's use of "inhaler" and frequent oxygen requests was consistent with other nurses.

e. improperly timed dispensation of sleeping pills with particular patient—valid reason established;

f. refused to administer a patient's pain pill—unsubstantiated;

g. made long, frequent calls to off duty nurses—patient oriented calls; though long, they did not constitute willful misconduct;

h. put blind patient to bed without meal because patient would not feed herself—patient was encouraged to care for self; complainant did not fill out report at time of incident "because it was so trivial"—single instance of good faith error of judgment;

i. failed to administer routine eye and ear drops—never done intentionally, occasionally omitted due to time constraints;

j. spent excessive time with one patient and worked crossword puzzles at desk—at most it is mere unsatisfactory conduct ·not rights to level of misconduct;

k. refused to perform personal hygiene procedure for comfort of certain patient—not doctor ordered, and not always necessary if time not available;

l. would not push wheelchair bound arthritic patient—patient to be encouraged to wheel self as supposed to go home; other nurses also denied assistance; and,

m. ate pizza in timeclock room—isolated incident, oral reprimand with no immediate written report made.

The Referee made special note that the reports of many of the incidents were not timely made, i.e., not rendered until requested. Consequently, he found it difficult to characterize them as acts of misconduct leading to discharge.

The only issue on appeal is whether the trial court erred in finding that Raml's actions prior to discharge did not constitute misconduct and therefore did not disqualify her from receiving unemployment compensation benefits. On review, we are not bound by a presumption that the circuit court was correct since we essentially review the agency decision as did the circuit court. *State Division of Human Rights v. Miller*, 349 N.W.2d 42, 46 n. 2 (S.D.1984); *In re State Water Management Board Approving Water Permit No. 1791-2*, 351 N.W.2d 119, 122 (S.D.1984). Rather, we will uphold the ruling unless, in light of the entire record, the decision is clearly erroneous or we are left with a firm and definite

conviction that a mistake has been made. SDCL 1–26–37; *see also South Dakota Department of Revenue*, 331 N.W.2d 828, 830 (S.D.1983).

■ The Referee correctly applied SDCL 61–6–14 to the facts, as interpreted in *Matter of Yaroch*, 333 N.W.2d 448 (S.D.1983), and stated:

[M]isconduct [within the meaning of the unemployment compensation statutes] is limited to conduct evincing such willful or wanton disregard of an employer's interest as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employees, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to his employer. On the other hand, mere inefficiency, unsatisfactory conduct, failure in good performance as a result of inability or incapacity, inadvertancies or ordinary negligence in isolated instances, or good faith errors in judgment or discretion are not to be deemed 'misconduct' within the meaning of the statute.

*Id.* at 449 (*quoting Boynton Cab Co. v. Neubeck*, 237 Wis. 249, 296 N.W. 636, 640 (1941)). Also, the Referee correctly noted this court's admonition that our unemployment insurance laws are to be liberally construed. *Redbird v. Meierhenry*, 314 N.W.2d 95 (S.D.1982).

■ The detailed findings initially made by the Appeals Referee and subsequently adopted by the Department Secretary and the circuit court are supported by the evidence. The nursing home has not revealed any errors of fact or law which would justify overturning the lower court's decision. *Johnson v. Skelly Oil Co.*, 359 N.W.2d 130, 132 (S.D.1984). Accordingly, we affirm.

MORGAN, and WUEST, JJ., and HERTZ, Acting J., concur.

HENDERSON, J., dissents.

HENDERSON, Justice (dissenting).

Today, across America, the disabled, elderly, and feeble are sheltered in what we now call "nursing homes." It is a social phenomena of familial change which has mushroomed into acceptance to such extent that it is a mores. It is called good by some and bad by others. For some souls, it can become a lonesome, living hell. This remarkable growth, I have witnessed in my lifetime. Except for rare instances, gone are the days when Mama and Daddy care for Grandpa and Grandma in their home.

Though nursing homes might be great edifices of stone, cement, mortar, and glass —yet, it is what is inside which measures if the care is a blessing or a curse. Often, a nursing home is a last resort and it indeed becomes a haven for those who cannot any longer fend for themselves. An inescapable obligation of a nursing home is to treat a resident or patient with compassion, tenderness, and lend emotional support. Woven into the medical care, there must be a spiritual input of love for a fellow human being. Without a caring environment inside, the outside is but a building to house a business. And nursing homes, as the population of the elderly has broadened and expanded, have become one of the big businesses in America. There must be deeply imbedded in these nursing homes, not just medicine and food, but blessings which are not measured in dollars and cents. Often, as one reads about nursing homes, we are left with the phrase that these people, who are in the twilight of their lives, must have "quality nursing care." The Employee Handbook, page 1, states:

Let us remember why we are here. We are here to provide quality nursing care, emotional, psychological, and spiritual support to our residents. Our facility is their home. For many of the residents, the staff is family. In no other working situation is it more important to render human service in a compassionate, loving, and vital way.

To this end, the Jenkins Methodist Home of Codington County prepared the "Jenkins Methodist Home Employee Handbook," duly entered in evidence as Exhibit 1, and the "Jenkins Methodist Home Patients' Bill of Rights—Final Form," received in evidence as Exhibit 2. Claimant Raml received both of these exhibits and was chargeable with knowledge of their contents. Particularly of note in the Employee Handbook is a paragraph found on page 15, which expressly relates to misconduct. It states:

> This facility realizes that the issues raised here [in the handbook] are made necessary because of misconduct and offenses of only a small number of employees. The majority of our employees perform loyally and efficiently. It is our desire to assist employees in every way possible so that working here is a meaningful, satisfying life experience. However, willful and inexcusable violations of these rules must be dealt with firmly under a uniform policy which applies equally to all departments, to all shifts and to all individuals.

These exhibits reflect the deep concern of the Jenkins Methodist Home to provide more than just food and medicine in a substantial edifice; rather, the Jenkins Methodist Home recognized, by preparing the Patients' Bill of Rights, that residents were encouraged to voice grievances and recommend changes in policies and services and to do so without fear of reprisal and without restraint, interference, or coercion. Each resident, by the said Patients' Bill of Rights, was to be free from mental and physical abuse and was to be treated with "consideration, respect, and full recognition of his dignity and individuality, including privacy in treatment and in care for his personal needs." By the Employee Handbook, of which claimant Raml was aware, there were several violations that were considered to be either violations "of concern" or "serious violations." These included:

(1) Inconsiderate treatment of others;

(2) Loitering or loafing;

(3) Abusive treatment of others;

(4) Neglect of duties;

(5) Disturbing others at work;

(6) Violation of department rules;

(7) Disruption of facility routine; and

(8) Extended use of telephone and particularly to "keep outgoing calls to an absolute minimum."

A strange facet of this case is that claimant Raml has admitted to committing acts contrary to this nursing home's Handbook and the Patients' Bill of Rights and the basic tenets of professional nursing.[*] These include: Admitting that it was possible she did forget to give eye and ear drops on busy nights but never intentionally failed to give the drops, all as found on page 5 of Referee's decision; admitting that she spent excessive time in one particular patient's room where testimony revealed that she would visit on and on, said admission being made to one Allen Swan, a nursing home official; admitting to the same gentleman that she had, habitually, worked crossword puzzles at her nurses' station while on duty; admitting that she had turned off one Edith Larson's light causing this resident to scream in fear as she was afraid of the dark (several nurses' aides corroborated that this had happened on several occasions and greatly distressed this resident); and admitting that she refused to allow nurses' aides to feed a blind diabetic resident. Claimant Raml is not entitled to unemployment compensation because of her conduct and general attitude at this nursing home and therefore this dissent is tendered to support the position of the Jenkins Methodist Home. It is noted in the record that claimant Raml asks for understanding of her personal life, expressing to her supervisor, Mary Cordell, that she had been undergoing many personal problems in her home life which had affected both her attitude and performance at work. Cordell's testimony revealed:

> various allegations were discussed with the Claimant and she admitted some of the items were true." *See* page 6 of Referee's decision.

---

[*] "When the Claimant arrived for work on November 30, she was called into the office to meet with Allen Swan and Mary Cordell. The

She said that for the last three and a half months or so she had sick children at home and lived on the farm and she does a lot of work at home and had been awfully nervous and had thought of asking for a leave of absence but because of financial reasons she wasn't able to do that and that she was upset and she was crying and she said that she felt very bad because this was her family, this was her—she was very concerned about everybody at home and all of that and at this time I don't remember very much else—she said she knew that some of those things were true, that she had been guilty of some of those things and she didn't specifically state which ones she felt were true and which ones weren't or anything.

Jenkins Methodist Home was faced with a very serious morale factor because of the on-duty conduct of claimant Raml. The nurses' aides on the third floor were threatening to leave the institution and requested a meeting to air their combined complaints against the on-duty conduct of claimant Raml. Pursuant thereto, a meeting did take place, all of which is substantiated by the record herein, and the nurses' aides, who had expressed their oral complaints, were requested to write up an "Employee Work-Incident Report" so that there would be a record for the staff to review.

Subsequent to the meeting and the filing of the incident reports, supervisors of claimant Raml began to hear further reports of work-related misconduct on the part of claimant Raml. Ultimately, five different reports were submitted and received into evidence which were highly condemning of the professional work and the general demeanor and conduct of claimant Raml to the patients and residents. Time and space forbids a full documentation by this author of the various complaints, but the most glaring violation of all involved a blind patient who had diabetes and had suffered the loss of both of her legs through amputation. This helpless individual needed someone to feed her but her mind was quite alert. Transcript testimony reveals that claimant Raml was most disrespectful to this helpless, blind lady and went so far as to tell nurses' aides not to feed her. An adverse admission by the claimant was made concerning the nurturing of this distressed individual. A witness testified that there were several times that this blind, helpless lady did not have her supper at night because claimant Raml either upset her or out-and-out refused to see that she was fed. Notwithstanding this testimony, adduced by a nurse, the Appeals Referee found otherwise; that is, essentially, that this blind diabetic whose legs were amputated, had not been abused. This was a clearly erroneous finding. However, the Appeals Referee was unquestionably troubled by Raml's conduct in this regard. On page 8 of the decision of the Appeals Referee, he finds:

> Finally, the Referee considers the matter of the Claimant's refusal to allow Louise Morotz to be fed. The Referee agrees that this is a most serious matter. However, the Claimant was trying to encourage Ms. Morotz to be more self-sufficient. The fact that the Claimant was trying to achieve this objective is commendable and is certainly not misconduct. Other nurses too had expressed the thought that Ms. Morotz could do more for herself and the Claimant carried through with the idea. The fact that the Claimant found it necessary to quarrel with the resident over the matter was certainly poor judgment. The patient had a right to be fed.

A supervisor/nurse testified that because of claimant Raml's conduct towards this blind diabetic, that she, herself, could hardly sleep one night and realized that claimant Raml's conduct was totally unacceptable conduct for a professional nurse.

There are other instances of on-duty misconduct; these include (1) failing to answer the lights when they were ringing and reading a newspaper at her desk, paying no attention to the residents, (2) letting the lights flash, while patients were ringing for help, as she worked on crossword puzzles at her desk (not in a patient's room), (3) reading newspapers on duty when patients

needed help, (4) making telephone calls and engaging in conversations for longer than ten minutes and discussing many items not related to work (substantiated by the testimony of nurses who worked with her on the floor and found in the record), and (5) refusing to promptly give medication and attention when required to do so in the interest of the patient.

Nurses' aides expressed that they could not work under these conditions with claimant Raml unless they were corrected. Jenkins Methodist Home found itself with a serious morale problem and its experienced employees about to quit because of the conduct of claimant Raml.

Aides indicated that they did not want to work with Raml because she would "make things miserable for us." These are not statements by this author, who has no personal knowledge of the facts. These are statements contained in the exhibits and in the transcript. A registered nurse filed a report, Exhibit 6 in the record, reflecting that claimant Raml was disrespectful to the residents and did not follow standard medical care of residents. The situation was so tense that the supervisor, Mary Cordell, testified:

> I sat down and they started to tell me about all of these problems that had developed and that they were very upset, some of them were crying. They told me they were going to walk off and they were going to go job hunting if something wasn't done about the situation.

Claimant Raml admitted at a hearing on May 8, 1984, at which time there was taken approximately eight hours of testimony, that she was, in her own words, "difficult or ... less than holy [sic] courteous to residents." If one reviews *Yaroch*, it becomes apparent that work-related misconduct was procrastination. *Yaroch* held that the employee took too long to complete several assigned tasks such as shoveling snow, trimming bushes, chopping weeds, and changing light bulbs. *Yaroch*, 333 N.W.2d at 449. Compare this type of conduct to the conduct at hand. Can there be any doubt that there was "an intentional

and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer"? *Id.* (citation omitted). We are not reviewing, in the case at hand, mere inefficiency, unsatisfactory conduct, or failure in good performance as a result of an inadvertency or an act of isolated negligence. We should be left with an inescapable conclusion that this claimant failed in her duties as prescribed by the Jenkins Methodist Home. The facts simply warrant a conclusion of misconduct.

We are confronted with the question of an employee's general behavior in a nursing home and whether that behavior which caused her to be discharged from her employer is work-connected misconduct as to disqualify her from unemployment benefits under SDCL 61–6–14 (then in effect) and the language of *Yaroch* (codified in SDCL 61–6–14.1). We are further faced with judging, from an appellate stance, the decision of the Appeals Referee to determine if the decision was "clearly erroneous in light of the entire evidence in the record." SDCL 1–26–36(5). Under the evidence, there was an intentional and substantial disregard of the employer's interests and of the employee's duties and obligations to her employer. *See* definition of work-connected misconduct contained in SDCL 61–6–14. Therefore, the Appeals Referee's decision was clearly erroneous. It is noted that the Appeals Referee found nearly all of the incidents of alleged misconduct of claimant Raml, to include her admissions of these acts, as facts. In light of the entire evidence in the record, a serious error was committed by the Appeals Referee in his conclusion that these acts did not constitute work-connected misconduct. Reference is made to the legal concept which was ingrained and inculcated into the Appeals Referee's decision. *See* page 8 of his decision which provides, inter alia:

> The fact that they [outside telephone calls] may have stretched out to cover matters not concerning patients certainly evinces unsatisfactory conduct but not willful or wanton misconduct.

Obviously, the Appeals Referee was confusing a concept of willful or wanton misconduct such as found in automobile negligence cases, with the theory of misconduct in an employer/employee relationship. The Appeals Referee noted that the extended periods of time in a patient's room while on duty and the working of crossword puzzles on duty is "certainly not behavior to be condoned." He could not find that it rose to a level of misconduct. In this case, the Appeals Referee committed another serious error by trying to establish that claimant Raml was entitled to be warned about her conduct prior to termination. There is no such requirement, to my knowledge, in order to establish misconduct. His rationale for a warning is found on page 9 of his formal decision. It seems that the Referee could not make that inductive leap of logic, by way of a conclusion of law, so vital to justice herein. Therefore, this reviewing Court should be left with a definite and firm conviction that a mistake has been committed as required by a host of decisions in this Court, to include Dakota *Harvestore v. South Dakota Dep't of Revenue*, 331 N.W.2d 828 (S.D.1983).

Jenkins Methodist Home should be applauded for its action in seeking quality care for the residents and by refusing to turn its eyes away from wrong; it should be sustained in its efforts to contest unemployment benefits, for, in so doing, it recoils from rewarding the discompassionate care of those who no longer can protect themselves from the rigors of a competitive society.